Of Counsel:

DAVIS LEVIN LIVINGSTON

MARK S. DAVIS                    1442-0
MICHAEL K. LIVINGSTON            4161-0
LORETTA A. SHEEHAN              4160-0
AIMEE M. LUM                    8364-0
Topa Financial Center, Fort Street Tower
745 Fort Street, Suite 1550
Honolulu, Hawaii 96813
Telephone: (808) 524-7500
Fax:          (808) 356-0418
Email:        lsheehan@davislevin.com
              alum@davislevin.com


Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ALLISON SMITH and ALEXANDER SMITH, Individually and as Next Friends of O.S., a Minor Child,<br><br>             Plaintiffs,<br>  vs.<br><br>UNITED STATES OF AMERICA and DOE DEFENDANTS 1-100,<br><br>             Defendants. | CIVIL NO.<br>(Federal Tort Claims Act)<br><br>**COMPLAINT; SUMMONS TO ANSWER COMPLAINT** |

## COMPLAINT

COME NOW Plaintiffs **ALLISON SMITH and ALEXANDER SMITH**, Individually and as Next Friends of **O.S.**, a Minor Child, (together, "Plaintiffs") by and through their attorneys, DAVIS LEVIN LIVINGSTON, and for a cause of action against the United States of America ("USA"), allege and aver as follows:

## INTRODUCTION

1.     This Complaint is filed pursuant to the provisions of the Federal Tort Claims Act ("FTCA"), 28, U.S.C. §§ 1346(b), 2671, *et seq*., against Defendant **UNITED STATES OF AMERICA** ("USA") for the catastrophic injuries sustained by Plaintiff O.S., a minor, during the course of labor and delivery at Tripler Army Medical Center ("TAMC") on October 6, 2024, and for the derivative injuries suffered by O.S.'s parents, Plaintiffs Allison Smith ("Allison") and Alexander ("Alex") Smith.

## JURISDICTION AND VENUE

2.     The physicians, nurses, midlevel providers and staff who breached the applicable standards of care, as hereinafter alleged, were at all relevant times acting within the course and scope of their employment with Defendant USA.

3.     This court has jurisdiction with respect to this lawsuit under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq*.

4.      Plaintiffs were citizens of the State of Hawaii at the time of the

Defendant USA's negligence and currently reside within the State of Hawaii.  The

injuries suffered by Plaintiffs occurred in the City and County of Honolulu, State of

Hawaii.  Venue is proper in the U.S. District Court for the District of Hawaii.

5.      Pursuant to the provisions of the FTCA, 28 U.S.C. §§ 2871, *et seq*.,

Plaintiffs filed administrative claims on July 23, 2025, for personal injury against

Defendant USA.

6.      Defendant USA acknowledged receipt of the FTCA claims forms on

July 28, 2025.

7.      Defendant USA acknowledged receipt of the administrative claim on

July 30, 2025.

8.      More than six months have elapsed since the filing of Plaintiffs'

administrative claim forms.  As of the date of the filing of this Complaint, Defendant

USA has not taken final administrative action on the Plaintiffs' claims and, therefore,

Plaintiffs have duly exhausted all administrative procedures, and have timely filed

this Complaint.

9.      On August 1, 2025, in the Circuit Court of the First Circuit, State of

Hawaiʻi, the Honorable Karin L. Holma issued an Order Granting Ex Parte Motion

for Appointment of Next Friends, wherein she appointed Allison and Alex as O.S.'s

Next Friends to protect O.S.'s interests and to pursue a civil action.

## THE PARTIES

10.     Allison, O.S.'s mother, is an individual who resided within the State of Hawaii at the time Defendant USA committed the subject negligent acts.  Allison brings this lawsuit in her individual capacity and as Next Friend of O.S., a minor.

11.     O.S. is a minor who resided within the State of Hawaii at the time Defendant USA committed the subject negligent acts.

12.     Alex, O.S.'s father, is an individual who resided within the State of Hawaii at the time Defendant USA committed the subject negligent acts.  Alex brings this suit in his individual capacity and as Next Friend of O.S, a minor.

## FACTUAL ALLEGATIONS

13.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs, as if fully set forth herein.

14.     Allison was admitted to TAMC on October 5, 2024, for induction of labor with O.S., her first child.

15.     On October 5, 2024, Allison was post-dates, at 40 weeks and 6 days.

16.     At 21:35, Allison's first vaginal examination showed the cervix to be 1 cm dilated, 20 percent effaced, with the fetus at -3 station.  Allison was not leaking fluid.

17.     Dr. Logan Fitzpatrick noted positive fetal movement and positive cardiac activity, both reassuring signs of fetal well-being.

3

18.    At the time, Dr. Logan Fitzpatrick was an employee of Defendant USA.

19.    Dr. Fitzpatrick provided medical treatment to Allison and O.S., then a fetus, during their labor and delivery in the course and scope of his employment with Defendant USA.

20.    A transabdominal ultrasound showed a single intrauterine pregnancy, cephalic presentation, posterior placenta and visually adequate fluid.

21.    Allison was placed on an external Fetal Heart Monitor ("FHM"), which measured the fetal heart rate and uterine contraction patterns on a Fetal Heart Trace ("FHT").

22.    A non-stress test conducted with the FHM attached to Allison showed the fetal heart rate to be 120 bpm with moderate variability, the presence of accelerations, no decelerations, and occasional contractions, i.e., a Category I FHT, providing reassuring signs of fetal well-being.

23.    A Category I FHT is considered normal, reflecting an adequately oxygenated and neurologically intact fetus.

24.    A Category III FHT is considered abnormal, reflecting an abnormal fetal acid-base status which can occur as the result of fetal asphyxia.

25.    A Category II FHT is considered indeterminate.

26.    A Cook catheter was placed for cervical dilation.  Induction was started with intravaginal misoprostol and IV Pitocin.

4

27.    Allison labored through the night.

28.    At 4:47, on October 6, 2022, Allison experienced spontaneous rupture of membranes.  A large amount of clear fluid was noted.

29.    At 5:00, Oxytocin, aka Pitocin was started at 2mu/minute and titrated up over the next several hours.

30.    Pitocin is a synthetically prepared hormone that stimulates contractions of uterine smooth muscle.

31.    Pitocin can cause contractions to be longer, stronger and closer together.

32.    At 6:41, an epidural catheter was placed by Certified Registered Nurse Anesthetist James Maliszewskyi.

33.    At 13:40, Pitocin was titrated up to 12 mu/min.

34.    At 14:52, Pitocin was decreased to 10 mu/min after a series of variable and late decelerations were noted on the FHT.

35.    At 15:00, Allison was noted to be 8 cm dilated and 100% effaced, -1 station.

36.    At 15:05, an Intrauterine Pressure Catheter ("IUPC") was placed within Allison's cervix to measure the strength, length and frequency of Allison's contractions with greater precision than the external transducer of the FHM.

37.    The IUPC immediately documented the presence of abnormally high uterine resting tone, aka hypertonus.

5

38.     Hypertonus is defined as uterine resting tone above 20-25 mm/hg.

39.     The uterine resting tone is the tension of the uterine muscle wall between contractions and/or pushing.

40.     Hypertonus exists when uterine resting tone between contractions and/or pushing (which occurs with contractions) measures above 20-25 mm HG or the 75th percentile.

41.     Hypertonus can have a negative effect on fetal oxygenation during labor and rob the fetus of adequate recovery time between contractions.

42.     Hypertonus can decrease the perfusion of oxygenated blood to the fetus.

43.     Without adequate resting periods between contractions, fetal reserve, i.e. the fetus' ability to tolerate periods of de-oxygenation during labor, can become exhausted.

44.     The IUPC was re-zeroed and reconnected.

45.     Again the IUPC immediately documented periods of hypertonus, above 40 mm/Hg.

46.     At and after 15:05, a series of late decelerations and/or variable decelerations repeatedly appeared on O.S.'s FHT.

47.     Late decelerations, defined as a visually apparent, gradual slowing of the fetal heart rate in which the deceleration reaches its nadir after the peak of the contraction, are a concerning sign during labor.

48.    Late decelerations are caused by decreased blood flow to the placenta (aka uteroplacental insufficiency) and can signify impending fetal acidemia.

49.    At 15:21 and 15:43, the Pitocin was titrated down to 5 then 3 mu/min but not turned off.

50.    At 17:00 and 17:30, the Pitocin was titrated back up to 7 mu/min.

51.    The resting tone of the uterus remained elevated from 15:17 through 18:29, frequently measuring > 40mm/hg and occasionally measuring as high as 60 mm Hg.

52.    Despite alarming hypertonus, the Pitocin drip was not discontinued.

53.    At 18:26, Certified Nurse Midwife Melissa Jones ("CNM Jones") conducted a sterile vaginal exam and determined the cervix to be 10 cm dilated, 100% effaced, and fetus at +1 station.

54.    At the time, CNM Jones was an employee of Defendant USA.

55.    CNM Jones provided medical treatment to Allison and O.S. during their labor and delivery in the course and scope of her employment with Defendant USA.

56.    At 18:26, Allison entered the second stage (of three stages) of labor.

57.    At 18:29, under the direction of CNM Jones, Allison began to push with every contraction.

58.    During the first hour of pushing, O.S.'s FHT displayed recurrent late decelerations.

7

59.    During the first hour of pushing, O.S.'s FHT displayed ongoing variable decelerations.

60.    During the first hour of pushing, the variability of O.S.'s FHT deteriorated from moderate to minimal.

61.    Variable decelerations are visually apparent, abrupt decreases in the fetal heart rate at least 15 bpm below the baseline and last for at least 15 seconds but less than 2 minutes.

62.    Recurrent variable decelerations that become deeper than 15 bpm below baseline and last longer than 15 seconds are more likely to be associated with fetal acidemia.

63.    Variability refers to fluctuations in the baseline of the FHT over time.

64.    Fetal heart rate variability is considered the most important predictor of adequate fetal oxygenation during labor.

65.    While moderate variability, i.e. an amplitude of 6-25 bpm, reliably predicts the absence of fetal acidemia at the time of observation, minimal variability, i.e., an amplitude of less than or equal to 5 bpm, does not.

66.    Absent variability has an amplitude change that is undetectable on FHT.

67.    Absent variability in conjunction with late or variable decelerations is presumed to reflect a significant risk for fetal acidemia.

68.    At 19:14, Dr. Alivia Sabatino performed an ultrasound to determine O.S's position.

69.    At 19:18, Dr. Sabatino attempted a manual rotation of O.S.'s head.

70.    At the time, Dr. Sabatino was an employee of Defendant USA.

71.    Dr. Sabatino provided medical treatment to Allison and O.S. during their labor and delivery in the course and scope of her employment with Defendant USA.

72.    At 19:18, O.S. developed tachycardia, i.e., an excessively high fetal heart rate, with a baseline of 180 bpm.

73.    A normal heartbeat for a full term fetus ranges between 120-160 bpm.

74.    Fetal tachycardia represents compensation by the fetus in response to insufficient oxygen.

75.    Fetal tachycardia indicates that the fetus is not tolerating labor.

76.    At 19:18, the standard of care required TAMC nurses and midwives to engage in maternal interventions, including discontinuing Pitocin, and to advocate for an expedited delivery via cesarean section.

77.    At 19:18, TAMC nurses and midwives failed to discontinue Pitocin.

78.    At 19:18, TAMC nurses and midwives failed to advocate for an expedited delivery via cesarean section.

79.    At approximately 19:25, a series of late decelerations were noted on the FHT.

9

80.     At 19:30, Registered Nurse Sophia Thompson ("Nurse Thompson") documented ongoing fetal tachycardia with the FHR baseline at 170 bpm, moderate variability, absent accelerations and recurring late decelerations.

81.     At approximately 19:30, hypertonus continued, with a uterine resting tone of 50-60 mm Hg.

82.     Despite an ongoing non-reassuring FHT CNM Jones instructed Allison to keep pushing.

83.     At 19:30, despite a non-reassuring FHT, to include persistent hypertonus, Pitocin was not discontinued, nor did nurses and/or midlevel providers for an expedited delivery.

84.     As of 19:42, ongoing recurrent deep late decelerations appeared on the fetal heart strip.

85.     As of 19:42, persistent hypertonus continued.

86.     As of 19:42, persistent fetal tachycardia continued.

87.     At 19:45, Nurse Thompson documented fetal tachycardia, moderate variability, the absence of accelerations in the FHT, the and the presence of "intermittent" late decelerations on the FHT.

88.     At 20:06, Nurse Thompson documented tachycardia with a fetal heart rate baseline of 170 bpm, and recurrent late decelerations.

89.     At 20:06, Nurse Thompson did not advocate for an expedited delivery.

10

90.    At the time, Nurse Thompson was an employee of Defendant USA.

91.    Nurse Thompson provided nursing care to Allison and O.S. during their labor and delivery in the course and scope of her employment with Defendant USA.

92.    At 20:12, the hypertonus continued, with uterine resting tone rising to 60-70 mm Hg.

93.    As of 20:12, the FHT continued to document extended, repetitive late decelerations.

94.    At 20:16, Allison was instructed to push with every other contraction due to the presence of FHR decelerations and fetal tachycardia.

95.    At 20:16, Nurse Thompson documented a "pushing tug of war".

96.    At about 20:48, Dr. Christopher Rosenmeyer called CNM Jones to review the FHT.

97.    At the time, Dr. Rosenmeyer was an employee of the USA.

98.    Dr. Rosenmeyer provided medical treatment to Allison and O.S. during their labor and delivery in the course and scope of her employment with Defendant USA.

99.    At around 20:48, Dr. Rosenmeyer and CNM Jones agreed that the FHT had deteriorated to a Category III, with **absent to minimal variability with no accelerations and late decelerations,**" reflecting an abnormal fetal acid-base status.

100.    A Category III FHT requires emergent delivery.

11

101.   At 20:48, Dr. Rosenmeyer failed to order an emergency cesarean section.

102.   At 20:48, Dr. Rosenmeyer failed to order Pitocin discontinued.

103.   At 20:58, Dr. Rosenmeyer came to the bedside and performed a "cervical exam to assess fetal descent."

104.   At 21:07, Dr. Rosenmeyer offered, and Allison accepted, an urgent cesarean section.

105.   At 21:07, the Pitocin was turned off.

106.   At 21:33, Allison was brought to the operating room ("OR").

107.   Anesthesia records document that the OR cesarean section was for "NRFHT", i.e., a Non-Reassuring Fetal Heart Tracing.

108.   At 21:30, the FHT was discontinued.

109.   At 21:40, anesthesia records documented the FHR at 158-163 bpm.

110.    At 21:56, Dr. Rosenmeyer started surgery.

111.   At 22:0,1 Dr. Rosenmeyer delivered O.S.

### *O.S.'s Delivery*

112.   At delivery, O.S. required assistance with breathing via Continuous Positive Airway Pressure ("CPAP").

113.   At delivery, O.S. was delivered limp, with no cry and no tone.

114.   O.S.'s APGAR scores at 1, 5, and 10 minutes of life were 4, 5, and 7.

12

115.    At 2 minutes of life O.S.'s oxygen reading via pulse oximeter was low at 15%, and he continued to lack movement.

116.    At 22:22, venous blood gases were obtained, revealing acidosis.

117.    At 22:22, O.S.'s pH was abnormally low at 7.114, with an abnormal base excess of -15.7.

118.    At 23:16, tests of capillary blood resulted with a normal pH of 7.21, but an abnormal base excess of -13.

119.    Laboratory testing demonstrated elevated AST/ALT/CK/CRP/PCT levels, a finding consistent with hypoxia during labor and delivery.

120.    Despite O.S.'s poor condition at birth and the results of laboratory testing of his blood revealing low pH, acidosis and injuries to the liver and kidneys, O.S.'s physicians failed to provide O.S. with therapeutic hypothermia (aka cooling).

121.    Therapeutic hypothermia was available at TAMC.

122.    Therapeutic hypothermia is a protocol which protects the brain from programmed cellular death, aka apoptosis, due to hypoxic ischemic injury inflicted during labor and delivery.

123.    Therapeutic hypothermia should commence within 4-6 hours of the oxygen-depriving event to be most effective.

124.   O.S. was treated in the Newborn Intensive Care Unit ("NICU") by pediatric resident Dr. NaKiera Evans, Fellow Dr. Lyndsay Long, and Attending Dr. Lauren Steiger.

125.   Despite evidence of hypoxic injury at birth, Dr. Steiger decided against providing O.S. with therapeutic hypothermia as required under the standard of care.

126.   Dr. Steiger documented that although O.S.'s venous cord gas met the *objective* biochemical criteria for therapeutic hypothermia, Dr. Steiger felt that O.S.'s *subjective* APGAR scores did not meet the criteria, ignoring the pertinent physical exam findings after delivery.

127.   Dr. Steiger conceded that although O.S. had required respiratory assistance via CPAP for hypoxemia, Dr. Steiger documented that O.S. did not require "extensive resuscitation."

128.   Dr. Steiger erroneously documented an "[e]xam consistent with no encephalopathy," an isolated brachial plexus palsy, and stated that O.S. did not meet the "exam/clinical criteria."

129.   Dr. Steiger documented "[r]isks of TH including need for central access, need for sedation, risks of coagulopathy and infant parent separation outweigh marginal to no benefit."

130.   Dr. Steiger did not discuss the decision to withhold the treatment of therapeutic hypothermia with Allison and Alex.

14

131.   TAMC physicians told Allison and Alex that O.S. was "fine," and "only needed a little support after birth."

132.   No TAMC physician informed Allison and Alex that O.S.'s blood tests had shown that O.S. had been acidotic at delivery.

133.   No TAMC physician informed Allison and Alex that O.S.'s blood tests had shown a negative base excess, reflecting a depletion of bicarbonate to compensate for an on-going acidosis.

134.   Allison and Alex were told that O.S. had sustained a possible shoulder injury at delivery but that he would be discharged within 48 hours.

135.   No physician informed Allison and Alex of consideration of therapeutic hypothermia, its risks and benefits, nor of the risks and benefits of failing to perform therapeutic hypothermia.

136.   On October 7, 2024, O.S. had difficulty maintaining his body temperature. He was hypothermic at 36.2 Celsius (97.16 Fahrenheit) on daily exam in the Mother Baby Unit, and his blood glucose levels  were  low.  He was rewarmed on the radiant warmer and his hypothermia resolved.

137.   O.S.'s hypothermia was attributed to environmental factors, despite O.S. needing double hats and blankets to maintain his body temperature off the warmer.

138.   On October 7, 2024, bruising was noted to O.S.'s right chest and linear bruising was noted to his right arm.  Bruising was further noted to O.S.'s head and a

15

left occipital hematoma was noted.  O.S. continued to have decreased tone of his right upper extremity, which was attributed to an arm injury.

139.   On October 8, 2024, TAMC day shift nurse on the Mother Baby Unit noted O.S. to be fussy but consolable.

140.   At 11:55 and 12:20, O.S. had an elevated temperature.

141.   Allison noted that O.S. was having abnormal movements.

142.   A charge nurse came to Allison's room, witnessed the abnormal movements and stated, "he's having a seizure and I am going to take him."

143.   The charge nurse brought O.S. to the nursery, where O.S. continued to seize uncontrollably.

144.   One seizure was noted to last 5 minutes.

145.   The NICU team was called to the nursery to assess O.S. and they rushed O.S. to the NICU.

146.   O.S. underwent a series of laboratory tests and examinations, with Hypoxic Ischemic Encephalopathy ("HIE") included in the differential diagnosis.

147.   O.S.'s NICU physicians documented a "strong suspicion" of HIE, given Owen's traumatic delivery, significant acidosis, elevated AST/ALT/CK/CRP/PCT levels at birth, irritability and uncoordinated suck.

148.   On the evening of October 8, 2024, NICU providers informed Allison and Alex that they could not get O.S.'s seizures to stop.

16

149.   Finally, TAMC neurologist Dr. Philip Eye informed Allison and Alex that O.S.'s seizures were due to a brain injury caused by inadequate oxygen during labor and delivery.

150.   Dr. Eye informed Allison and Alex that O.S. had been denied cooling.

151.   Through Dr. Eye, Allison and Alex learned, for the first time, of O.S.'s acidosis at delivery.

152.   On October 10, 2024, Dr. Rosenmeyer met with Allison and Alex to discuss O.S.'s seizures and the evidence of "a unilateral intracerebral infarct/ischemic event."

153.   When asked by Allison and Alex what had "happened with delivery" from his perspective, Dr. Rosenmeyer stated that "after reviewing the course of Allison's labor," he did not "have the answer of why at this point."

154.   When asked by Allison and Alex what had "happened with delivery" Dr. Rosenmeyer did not inform Allison and Alex of his conclusion that the FHT had displayed a Category III trace, necessitating emergent delivery.

155.   When asked by Allison and Alex what had "happened with delivery" from his perspective, Dr. Rosenmeyer did not inform Allison and Alex of the FHT documentation of repetitive late decelerations, repetitive variable decelerations, decreased variability, fetal tachycardia, of the long periods of hypertonus, aka

excessive uterine activity, O.S's physical exam findings at birth, nor of the results of O.S.'s blood tests run after delivery.

156.    O.S. remained in the hospital until October 20, 2024, when he was discharged home with his parents.

157.    After discharge, O.S. continued care with Dr. Eye.

158.    On October 23, 2024 in a follow up outpatient visit Dr. Eye documented: "MRI confirmed HIE with ischemic injury in a nonvascular territory to the L cortex, basal ganglia and thalamus with milder injury to the R thalamus." He noted control of seizures with phenobarbital.

159.    On December 2, 2024, Dr. Eye noted "pt remains at high risk of CP [cerebral palsy], developmental delay and epilepsy into the future." Dr. Eye placed referrals for speech, developmental-behavioral pediatrics, and hearing testing on January 6, 2025.

160.    Dr. Eye left Hawaii in early 2025, and O.S. established care with Pediatric Neurologist Dr. Gregory Yim in March 2025. Dr. Yim ordered follow up EEG's MRI's and Keppra for seizure control.

161.    Dr. Yim also ordered a complete coagulation workup including Protein S, C, antithrombin III, anticardiolipin antibody and Factor V Leiden to rule out any hematologic conditions as the cause of O.S's brain injury. All tests were noted to be unremarkable and negative.

162.    Repeat MRI and MRA testing was performed at Kapiolani Medical Center for Women and Children ("Kapiolani") on June 25, 2025.  Subtle encephalomalacia/gliosis was noted in the left basal ganglia and the left parietal lobe.  No evidence of large vessel occlusion or high-grade stenosis was noted on MRA.  A small unrelated right vertebral artery was noted **as unrelated** to any brain injuries sustained.

163.    On July 10, 2025, Dr. Yim concluded that O.S.'s blood vessels on the MRA did not indicate a congenital malformation of the brain to be the cause of his encephalomalacia and brain injuries.  He also documented that there was no evidence of a metabolic disorder on the MRI.

164.    On July 10, 2025, Dr. Yim, after ruling out other causes, diagnosed Owen with right hemiparetic cerebral palsy, developmental delay secondary to hemiparesis, partial epilepsy and static encephalopathy.

165.    Dr. Yim informed Allison and Alex that the cause of O.S's injuries was HIE after ruling out any other cause.

166.    O.S. is now 15 months old, and is undergoing physical therapy, occupational therapy and speech therapy at TAMC.  He has difficulty walking due to right leg weakness and uses a walker.  He experiences knee and leg pain due to his right leg buckling.  He has ongoing seizures and must take daily seizure medication.

19

He has difficulty eating and pockets food.  He is on medication to stimulate his appetite.  He cannot maintain his weight.  He is developmentally delayed.

167.   O.S. continues to be treated by Dr. Yim at Kapiolani, and in the Developmental Pediatrics' clinic and by Primary Pediatric Care at TAMC and at Shriners Hospital.  O.S. will require care for the rest of his life due to severe injuries sustained at Tripler during labor and delivery.

## FIRST CLAIM
## MEDICAL NEGLIGENCE

168.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs, as if fully set forth herein.

169.   At all relevant times, Defendant USA had a duty to its patients to protect them from foreseeable risks of harm, through the use of reasonable care in the maintenance of safe and adequate facilities and equipment, the selection and retention of competent health care providers, to include certified nurse midwives and physicians, the oversight of persons who provide health care in the hospital, and the formulation, adoption, and enforcement of adequate and appropriate rules, policies, and procedures to ensure safe care for patients.  For the reasons set forth herein, Defendant USA breached the aforesaid duty, and said breach was a substantial factor in causing injury to O.S.  Accordingly, Defendant USA is liable under the doctrine of corporate negligence.

170.   At all relevant times, the health care providers employed by Defendant USA each owed a duty to Plaintiffs to exercise that degree of care, skill and diligence ordinarily exercised by such Defendants in the application of their skills in the performance of their professions.  For the reasons set forth herein, the employees of the USA breached their aforesaid duties, and each breach, individually and collectively, was a substantial factor in causing injury to D.G.  Accordingly, Defendant USA is liable under the doctrine of *respondeat superior.*

171.   Defendant USA breached its aforementioned duties of care owed to the Plaintiffs by its:

a.  Failure to recognize and respond to signs of fetal intolerance to labor in a timely manner;

b.  Failure to supervise the health care providers assigned to manage Allison's labor and delivery;

c.  Failure to escalate Allison's level of care during the second stage of labor;

d.  Failure to document adequately the midwifery and nursing care provided during labor;

e.  Failure to recognize and respond appropriately to Category III FHT;

f.  Failure to order a STAT cesarean section in the face of Category III FHT;

g.  Negligent use of Pitocin (oxytocin) during labor and delivery;

21

h. Failure to recognize and respond appropriately to hypertonus, aka excessive uterine resting tone;

i. Negligent management of the fetus during labor and delivery;

j. Failure to recognize and respond appropriately to signs and symptoms of fetal asphyxiation at delivery;

k. Failure to recognize and respond appropriately to signs and symptoms of HIE at delivery;

l. Failure to perform an adequate evaluation for therapeutic hypothermia for O.S. after delivery;

m. Failure to provide therapeutic hypothermia to O.S.; and

n. Failure to provide adequate neonatal evaluations post-delivery.

## SECOND CLAIM
## <u>FAILURE TO PROVIDE AND OBTAIN INFORMED CONSENT</u>

172.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs, as if fully set forth herein.

173.    At all relevant times, Allison's and O.S.'s physicians had a duty to inform Allison and Alex of:

a. The condition to be treated;

b. A description of the proposed treatment or procedure;

c. The intended and anticipated results of the proposed treatment or procedure;

22

   d.  The recognized material risks of serious complications or mortality

     associated with:

      i.  The proposed treatment or procedures;

      ii. The recognized alternative treatments or procedures; and

      iii. Not undergoing any treatment or procures.

   e.  The recognized benefits of the recognized alternative treatments or

     procedures.

174.  Defendant USA breached its aforementioned duties of care owed to the

    Plaintiffs by its:

   a.  Failure to inform Allison and Alex of the signs and symptoms at

     delivery indicating HIE;

   b.  Failure to inform Allison and Alex of the treatment modality being

     considered, i.e. therapeutic hypothermia;

   c.  Failure to review the risks and benefits of therapeutic hypothermia with

     Allison and Alex; and

   d.  Failure to review the risks and benefits of not undergoing therapeutic

     hypothermia with Allison and Alex.

### THIRD CLAIM
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

175.   Plaintiffs re-allege and incorporate by reference the foregoing

paragraphs, as if fully set forth herein.

23

176.   As a direct and proximate result of Defendant USA's negligence, as aforesaid, O.S.'s parents, Allison and Alex, have suffered and will continue to suffer severe emotional distress.  Allison and Alex are therefore each entitled to recover general damages in amounts to be proven at trial.

## FOURTH CLAIM
## <u>LOSS OF CONSORTIUM</u>

177.   Plaintiffs re-allege and incorporate by reference the foregoing paragraphs, as if fully set forth herein..

178.   As a direct and proximate result of Defendant USA's negligence, as aforesaid, O.S.'s parents, Allison and Alex, have suffered and will continue to suffer loss of O.S.'s society, comfort, consortium, companionship, attention, and care. Allison and Alex are therefore entitled to recover general damages in amounts to be proven at trial.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Defendant USA for such special and general compensatory damages as are appropriate, together with costs of suit, attorney's fees, pre-judgment interest, post-judgment interest and such additional relief as the Court deems just and proper under the circumstances.

24

DATED:     Honolulu, Hawaii, February 5, 2026.

/S/ LORETTA A. SHEEHAN
MARK S. DAVIS
MICHAEL K. LIVINGSTON
LORETTA A. SHEEHAN
AIMEE M. LUM

Attorneys for Plaintiffs